25 F.3d 1052
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Johnny TEMPLE, Defendant-Appellant.
 No. 93-6206.
 United States Court of Appeals, Sixth Circuit.
 May 20, 1994.
 
 Before: GUY and NELSON, Circuit Judges; and LIVELY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant was convicted and sentenced for violating 21 U.S.C. Sec. 841(a). On appeal, defendant argues for the reversal of his conviction on numerous grounds. He contends, among other things, that the district court mishandled the voir dire; erred in qualifying an expert witness offered by the prosecution; and conducted itself in an inappropriate, prejudicial manner at trial. Defendant also takes issue with his sentence, arguing that the district court should have awarded him a reduction in his offense level for acceptance of responsibility; that the 100:1 cocaine to cocaine base equivalency established by 21 U.S.C. Sec. 841(b) for sentencing purposes violates his constitutional rights; and that the court improperly enhanced his sentence pursuant to 18 U.S.C. Sec. 3147 and U.S.S.G. Sec. 2J1.7. For the following reasons, we affirm.
 
 I.
 
 2
 In June 1991, Johnny Temple was indicted by a federal grand jury for his participation in two cocaine transactions.[1] The first such transaction (Count 2) occurred on August 31, 1989. On this date, Eric Patton, an agent with the Tennessee Bureau of Investigation, purchased approximately 21.3 grams of cocaine from Temple and co-defendant Marilyn Harris for $1,120. The second transaction for which Temple was charged (Count 4) took place on October 19, 1989. On this occasion, Temple sold approximately .58 grams of cocaine base to Ricky Cooper, a confidential informant cooperating with the Tennessee Bureau of Investigation.
 
 
 3
 Subsequent to his indictment, Temple moved the court, inter alia, to dismiss the indictment, arguing that the government had failed timely to indict him. In a separate motion to dismiss, Temple asserted that the government was precluded from prosecuting him in this instance "for the reason that the offenses charged in [the indictment] were contained in a prior plea bargain agreement with the prosecution in another matter." (App. 59.) On February 9, 1993, the district court, in accordance with the recommendation of a magistrate judge, entered an order denying both motions to dismiss.
 
 
 4
 On February 10, 1993, a jury found Temple guilty. He was subsequently sentenced to a 46-month term of imprisonment, 13 months of which was attributable to an enhancement made pursuant to 18 U.S.C. Sec. 3147. This appeal followed.
 
 II.
 A.
 
 5
 Temple first argues that the district court erred by not granting his motion to dismiss because in August 1989 he had entered into a plea agreement with the government in a separate case, which agreement precludes this prosecution. Even though the cocaine transactions that form the basis for the present appeal occurred after this plea agreement was reached, Temple contends the government assured him that these later transactions would nevertheless become part of the agreement. According to Temple, the government intended to "wipe the slate clean" and thus was precluded from pursuing "all current matters pending against him in the Court and all matters under investigation at that time." In short, Temple claims that the government bargained away its prerogative to prosecute him for the offenses that are the subject of this appeal.
 
 
 6
 Aside from Temple's own assertions, there is nothing in the record to substantiate his claim that the plea agreement encompassed post-agreement unlawful acts committed by Temple. Indeed, we agree with the magistrate judge's conclusion that to the extent the record speaks to this issue, it militates in the government's favor.[2]
 
 
 7
 Temple's alternative basis for dismissal--the government's failure timely to indict him--is equally unavailing.[3] As this court has previously explained: "Dismissal for pre-indictment delay is warranted only when the defendant shows substantial prejudice to his right to a fair trial and that the delay was an intentional device by the government to gain a tactical advantage." United States v. Brown, 667 F.2d 566, 568 (6th Cir.1982); see also United States v. Atisha, 804 F.2d 920, 928 (6th Cir.1986) ("A showing of prejudice to the defendant, without more, is not enough to prove a due process violation; rather, there must also be a consideration of the reasons for the delay."), cert. denied, 479 U.S. 1067 (1987).
 
 
 8
 Because we determine that Temple has not suffered substantial prejudice as a result of the government's delay, we need not proceed to consider the government's motives. Temple, in other words, has not satisfied his burden under Brown. To support his claim to prejudice, Temple does little more than proclaim that "the government's delay severely handicapped the defendant in being able to defend himself against these charges." In the absence of a more compelling demonstration of prejudice, we cannot conclude that the district court's denial of Temple's motion to dismiss constitutes error.[4]
 
 B.
 
 9
 Next, Temple assigns error to the way in which the district court conducted voir dire.[5] We review a district court's handling of the voir dire under the following standard set forth by this court in United States v. Phibbs, 999 F.2d 1053, 1071 (6th Cir.1993), cert. denied, 114 S.Ct. 1070 (1994):
 
 
 10
 [W]e must ascertain whether the court "abused the broad discretion vested in him by the rulings of the Supreme Court of the United States in his impaneling of [the] jury." A trial court "retains great latitude in deciding what questions should be asked on voir dire." So long as the court ensured that the defendant or defendants had "a fair trial by a panel of impartial, 'indifferent' jurors", reversal is not mandated.
 
 
 11
 (Citations omitted.) Specifically, Temple contends that while both parties submitted questions to the court for presentation to the jury, the court rejected most of his questions and accepted most of the prosecution's questions.[6] Temple argues that the disparate treatment afforded the parties by the court compromised his right to trial by an impartial jury.
 
 
 12
 Notwithstanding Temple's argument, it appears that the court took numerous steps to ensure the impartiality of the individual members of the jury. For instance, the court explained to the prospective jurors that Temple was to be presumed innocent and that the prosecution had the burden of proving guilt beyond a reasonable doubt. The court also asked the jurors whether they knew the attorneys or parties involved in the case; whether they had family members who either had been involved in law enforcement or had been the victim of a crime; whether they had any particular impressions (favorable or otherwise) of the judicial system; whether they or any of their family members had a drug-related problem; and whether, due to the nature of the offense or their own personal or religious beliefs, they would have difficulty rendering a fair and impartial verdict. In light of its actions, we are satisfied that the district court did not abuse its discretion by impaneling the jury in the manner it did. See Phibbs, 999 F.2d at 1071 (noting (1) that court examined panel members concerning the presumption of innocence, the meaning of reasonable doubt, and their knowledge of the case and (2) that the court had asked members about their impressions of the criminal justice system, predispositions regarding drug prosecutions, whether they could set aside personal feelings, and whether they had been a victim of a crime).
 
 
 13
 In his second challenge to the jury selection process, Temple maintains that the district court erred by permitting the prosecution to exercise race-based peremptory challenges to excuse African-Americans from the jury panel. In Batson v. Kentucky, 476 U.S. 79, 89 (1986), the Supreme Court announced that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." The Batson Court went on to outline a new, three-step process for evaluating claims that a prosecutor's use of peremptory strikes has violated a defendant's equal protection rights. Id. at 96-98. The Court in a subsequent case described that process as follows:
 
 
 14
 First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.
 
 
 15
 Hernandez v. New York, 111 S.Ct. 1859, 1866 (1991).
 
 
 16
 Here, the prosecution, in two rounds of questioning, challenged four individuals. Of these individuals, three were African-Americans and one was a white attorney. Defense counsel raised Batson objections after each round of questioning. To the second such objection, the court responded: "I don't see any Batson issue whatever raised. There are two black jurors seated on the panel that the government did not challenge. The one challenged said he had a hard time sending anybody to jail, had trouble doing that." (App. 124.) Again, Temple offers no specific evidence to refute the court's analysis of what occurred beyond his own allegation that the exclusion of African-Americans "occurred frequently enough so that a pattern of discrimination could be established." It appears, then, that Temple urges this court to accept his argument based solely on the fact that three of the excluded veniremen were African-American. Stated simply, this fact alone is not enough to raise an inference that the exclusion was race-based and therefore proscribed by Batson. Accordingly, we reject Temple's Batson argument. See United States v. Hatchett, 918 F.2d 631, 637 (6th Cir.1990) ("All of the attendant circumstances do not raise an inference that the prosecutor excluded Blacks from the jury on account of their race."), cert. denied, 111 S.Ct. 2839 (1991).
 
 C.
 
 17
 Temple also contests the district court's rulings with respect to two government witnesses, Lisa Mays and Ricky Cooper. As to Mays, a forensic chemist with the Tennessee Bureau of Investigation Criminal Laboratory, Temple argues that the district court erred by qualifying her as an expert witness. Specifically, Temple notes that Mays has only a "basic college degree" and that no testimony was offered to indicate the number of times she had tested cocaine. Moreover, according to Temple, there was no proof offered to demonstrate that the equipment used to test the cocaine was in proper working order.
 
 
 18
 Rule 702 of the Federal Rules of Evidence provides that, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." "[T]he trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." Salem v. United States Lines Co., 370 U.S. 31, 35 (1962); see also K.M.C. Co. v. Irving Trust Co., 757 F.2d 752, 764 (6th Cir.1985). Moreover, as we stated in Davis v. Combustion Engineering, Inc., 742 F.2d 916, 919 (6th Cir.1984), "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact."
 
 
 19
 Given Mays's background, Temple's objection to her qualifications is untenable. After obtaining an undergraduate degree in chemistry, Mays began working for the Tennessee Bureau of Investigation. She received five months of specialized training from the Bureau and also attended a drug analysis seminar run by the Drug Enforcement Agency. Mays testified that she had conducted the test that was done in this case "[s]everal thousand" times (app. at 148) and that the instrument used to perform the test, an infrared spectrometer, would never, to her knowledge, yield an incorrect spectrum (i.e., analysis). Based on Mays's credentials and experience, we conclude that the district court properly allowed her to testify as an expert.
 
 
 20
 As to Cooper, Temple argues that the district court erred by preventing defense counsel from questioning him about a pending criminal indictment, which charged Cooper with robbing his former place of employment. Defense counsel should have been allowed to question Cooper concerning his alleged involvement in the crime because, Temple asserts, such questions would have gone to Cooper's credibility.[7] Indeed, the district court apparently acknowledged as much when it stated that the offense for which Cooper was indicted "generally goes to dishonesty, truthfulness or untruthfulness[.]" (App. 157.) The court nevertheless prevented defense counsel from questioning Cooper along these lines for two reasons. First, the court determined that defense counsel had a sufficient opportunity to disparage Cooper's credibility in relation to numerous other crimes for which he had actually been convicted.[8] Second, the court noted that because Cooper had yet to be convicted on his robbery charge, he would be able to, in the instant action, invoke the Fifth Amendment and thereby refuse to answer questions related to that charge.[9] We are persuaded that, under these circumstances, the district court did not abuse its discretion by prohibiting defense counsel from asking the questions at issue.
 
 D.
 
 21
 In the final two challenges to his conviction, Temple takes issue with statements made by the court and the prosecution during the course of the proceedings below. Temple contends that the court instructed witnesses as to how to answer questions, unnecessarily interrupted defense counsel, and inappropriately commented on the length of the trial.
 
 
 22
 In United States v. Slone, 833 F.2d 595 (6th Cir.1987), this court discussed the manner in which a district court should conduct itself at trial. The court, we stated,
 
 
 23
 should conduct a trial in an orderly way with a view to eliciting the truth and to attaining justice between the parties. He must see that the issues are not obscured and that the testimony is not misunderstood....
 
 
 24
 The presiding judge, however, must be careful to " 'always be calmly judicial, dispassionate and impartial. He should sedulously avoid all appearances of advocacy as to those questions which are ultimately to be submitted to the jury.' " " 'The basic requirement is one of impartiality in demeanor as well as in actions.' "
 
 
 25
 Id. at 597 (citations omitted).
 
 
 26
 We are satisfied that the district court in the instant case did not violate the principles enunciated in Slone. Temple cites several specific comments made by the court to support his claim that the court was more an advocate than an impartial arbiter. As the government correctly points out, however, Temple's reliance on these comments is misguided. For instance, Temple cites the following exchange, which took place during the examination of Agent Patton:
 
 
 27
 Q. On that date, Agent Patton, how did you happen to come into the Ripley area and work on that investigation? Tell us a little bit about how that began.
 
 
 28
 A. I was working with an informant of mine that stated he could--
 
 
 29
 MR. BRANNON [defense counsel]: Objection.
 
 
 30
 THE COURT: Don't testify as to what the informant told you. You are not going to be able to testify to that.
 
 
 31
 (App. 167-68.) That Temple would take issue with the court's instruction here is curious particularly since the instruction actually benefits him, i.e., it essentially sustains defense counsel's objection.[10]
 
 
 32
 As to Temple's claim that the court interrupted defense counsel during cross-examination, a review of the trial transcript reveals that the court only did so to prevent counsel from asking repetitive questions. See app. at 177 ("He has told you three times that his purpose in coming to Ripley was to buy drugs from Mr. Temple."); app. at 178 ("Mr. Brannon, look, ask him once, and then let's move on."). Moreover, the final statements that Temple complains of were made outside the presence of the jury, and therefore cannot serve as the basis for reversal. See app. at 180 (telling defense counsel not to lean on jury box); app. at 181 ("[T]his jury is mad in my judgment at the tedious pace of the trial, and I think they are probably not very pleased that they are sitting back there in the jury room right now. I would suggest that it would be very much in everyone's interest to get the jury in the courtroom and to proceed.").
 
 
 33
 Turning to the contested statements made by the prosecution, we note that, here too, Temple's claim is without merit. Temple maintains that during its closing argument the prosecution referred to him as a "drug dealer" and then as a "dishonest drug dealer." In the wake of these comments, Temple unsuccessfully moved for a mistrial. Temple argues that the court erred by denying his motion, and by thus "allow[ing] the government to unfairly narrate to the jury and to make their conclusions for them."
 
 
 34
 Assertions of prosecutorial misconduct are judged according to the following standard: "The relevant question is whether the [misconduct] 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). "To warrant a new trial ... prosecutorial misconduct 'must be so pronounced and persistent that it permeate[d] the entire atmosphere of the trial.' " United States v. Mahar, 801 F.2d 1477, 1503 (6th Cir.1986) (quoting United States v. Thomas, 728 F.2d 313, 320 (6th Cir.1984)).
 
 
 35
 In the present action, the government contends that it labeled Temple as a "dishonest drug dealer" only to counter comments made by defense counsel during counsel's closing argument.[11] In this sense, the government argues for the application of the "invited response" doctrine. See United States v. Young, 470 U.S. 1, 12-13 (1985) ("[I]f the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction.") (footnote omitted). We need not consider whether to apply the doctrine, however, for the prosecution's concededly pejorative description of Temple, by itself, simply does not give rise to a legitimate claim of prosecutorial misconduct. In short, the prosecution's isolated remarks were in no way pronounced or persistent, and thus, they did not unfairly prejudice Temple. See United States v. Hurst, 951 F.2d 1490, 1503 (6th Cir.1991), cert. denied, 112 S.Ct. 1952 (1992).
 
 III.
 A.
 
 36
 In addition to contesting his conviction, Temple also mounts several challenges to his sentence. For instance, he argues that the district court erred by not granting him a two-level reduction in his offense level for acceptance of responsibility under U.S.S.G. Sec. 3E1.1. Notwithstanding the fact that he exercised his right to a jury trial,[12] Temple insists that he should have received the reduction because he admitted his involvement in and accepted responsibility for the crimes detailed in his indictment.
 
 
 37
 The sentencing judge is in the best position to evaluate a defendant's acceptance of responsibility. The sentencing judge's determination is thus entitled to great deference on review and should be sustained unless it is clearly without foundation. United States v. Wilson, 878 F.2d 921, 923 (6th Cir.1989). Here, in rejecting Temple's request for a section 3E1.1 reduction, the court stated:
 
 
 38
 [T]he Court recognizes that the points for acceptance of responsibility can sometimes be appropriate when an individual has gone to trial. It's sometimes appropriate when an individual is trying to preserve some legal issue, but this is just really not such a situation. Those situations tend to be very unusual circumstances.... Acceptance of responsibility is appropriate for someone who does not decide to raise every technical issue that he might raise during the course of the trial.... It is for someone who, by his conduct and attitude, says, "I did this. I fully accept responsibility for it. I accept what's coming to me. I'm going to tell the full and truthful story." It's not for someone who at the very last moment, when faced with the prospect of sentencing, tells the judge, "Oh, after all, I want it both ways. I want to do it the way I set out to do it, but now, Judge, I want to come in at the last minute and say I did it and have you give me acceptance of responsibility points." Acceptance of responsibility credit is based on the overall conduct, the full acknowledgement of guilt, the full acceptance of one's own wrongdoing, and I do not see that in Mr. Temple. I have not seen it throughout the proceedings. I did not see it in his interview with the probation officer, and frankly did not see it in his statement today, except when his counsel finally sort of brought him back to it and prompted him about it, and then finally we [saw] Mr. Temple say, "Oh, well, yes, I was involved, and I was convicted by the jury."
 
 
 39
 (App. 194-95.) We are in agreement with the court's statement of the law and its application of that law to the facts at hand. Accordingly, we affirm its decision not to award Temple a section 3E1.1 reduction.
 
 B.
 
 40
 In his next challenge to his sentence, Temple argues that the court erred in relying on 21 U.S.C. Sec. 841(b), which equates, for sentencing purposes, 100 grams of cocaine with 1 gram of crack cocaine. Specifically, he maintains that the 100:1 ratio established by Sec. 841(b) has a disproportionately adverse effect on African-Americans and that it therefore violates his constitutional rights to due process and equal protection. We, however, have consistently rejected this and other similar arguments. See, e.g., United States v. Reece, 994 F.2d 277, 278 (6th Cir.1993) ("This circuit repeatedly has upheld the cocaine-crack equivalency against all manner of constitutional attack, including the claim of racial discrimination."); United States v. Williams, 962 F.2d 1218, 1227-28 (6th Cir.) (rejecting equal protection challenge to equivalency), cert. denied, 113 S.Ct. 264 (1992); United States v. Pickett, 941 F.2d 411, 419 (6th Cir.1991) (rejecting substantive due process and Eighth Amendment challenges to equivalency). We are bound by these previous decisions.
 
 C.
 
 41
 Finally, Temple argues that his sentence was improperly enhanced pursuant to 18 U.S.C. Sec. 3147 and U.S.S.G. Sec. 2J1.7. The former provision states:
 
 
 42
 A person convicted of an offense committed while released under this chapter shall be sentenced, in addition to the sentence prescribed for the offense to--
 
 
 43
 (1) a term of imprisonment of not more than ten years if the offense is a felony; or
 
 
 44
 (2) a term of imprisonment of not more than one year if the offense is a misdemeanor.
 
 
 45
 A term of imprisonment imposed under this section shall be consecutive to any other sentence of imprisonment.
 
 
 46
 18 U.S.C. Sec. 3147. The latter provision provides: "If an enhancement under 18 U.S.C. Sec. 3147 applies, add 3 levels to the offense level for the offense committed while on release as if this section were a specific offense characteristic contained in the offense guideline for the offense committed while on release." U.S.S.G. Sec. 2J1.7.
 
 
 47
 Temple contends that a section 2J1.7 enhancement is inappropriate in his case because he committed the offenses that form the basis for the instant action while on release in connection with a separate state charge. Temple adds that section 2J1.7 applies only to defendants who commit federal offenses while on release from a federal charge. Again, however, Temple's argument is without merit. Although we concur with Temple's assertion that an underlying state charge will not "trigger" a section 2J1.7 enhancement, we note that Temple did, indeed, commit the offenses at issue here while released on bond from a federal charge.[13]
 
 
 48
 AFFIRMED.
 
 
 
 [1]
 Also named as a defendant in the indictment was Marilyn Harris. While Harris was charged in all four counts of the indictment, Temple was only charged in Counts 2 and 4
 
 
 [2]
 As the magistrate judge observed:
 Mr. Temple testified at the hearing [on his motion to dismiss] that negotiations between him and the government resulted in an agreement that his guilty plea would end the prosecution against him. There is no indication that that agreement was not carried out. The offenses for which Mr. Temple is charged in this indictment all allegedly occurred after his guilty plea on August 14, 1989.
 ....
 The transcript of the sentencing hearing reflects that counsel for the government brought up new accusations against Mr. Temple, which allegedly occurred after he entered his guilty plea, not for the purpose of having the court consider them in Mr. Temple's sentencing in [his initial prosecution], but rather in an attempt to block Mr. Temple's further release on bond. There is nothing in the transcript of the sentencing hearing that indicates any deal had been made with respect to these new charges. Indeed, if anything can be inferred from the hearing, it would be that the government intended to pursue the charges. Mr. Temple elected to proceed with his guilty plea even after he learned of the new accusations.
 (App. 66-67.)
 
 
 [3]
 Here, Temple notes that he was not indicted for the August and October 1989 cocaine transactions until June 1991
 
 
 [4]
 Even if we were to assume that Temple has satisfied the first prong of the Brown test by demonstrating substantial prejudice, Temple would still have to prove that, in delaying the indictment, the government was not acting in good faith, i.e., that it was attempting to gain a tactical advantage. It appears, however, that the government waited to indict Temple for an entirely appropriate reason: its fear that an earlier indictment in Temple's case might jeopardize a larger investigation that was ongoing in the same general area of Tennessee. See United States v. Brown, 959 F.2d 63, 66 (6th Cir.1992) ("[P]articularly where the delay is investigative rather than intended to gain a tactical advantage over the accused, preindictment delay does not offend the Fifth Amendment.")
 
 
 [5]
 Rule 24(a) of the Federal Rules of Criminal Procedure provides that:
 The court may permit the defendant or the defendant's attorney and the attorney for the government to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event the court shall permit the defendant or the defendant's attorney and the attorney for the government to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper.
 
 
 [6]
 The government disputes Temple's claim that the court did not give due consideration to his concerns. The government notes that the court, in its voir dire, covered many of the questions Temple himself had proposed
 
 
 [7]
 Rule 608(b) of the Federal Rules of Evidence provides that:
 (b) Specific instances of conduct.--Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.
 The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of the accused's or the witness' privilege against self-incrimination when examined with respect to matters which relate only to credibility.
 
 
 [8]
 Among these former convictions were convictions for forgery and shoplifting
 
 
 [9]
 In this regard, the court stated:
 You know [Cooper] is not going to be able to answer those questions, and I can't really see--I guess I could send the jury out and find out if he wants to claim his Fifth Amendment privilege with respect to that, but I think given everything else you have got to ask him about, I am going to exercise, and that is within the discretion of the court, that you should not be able to ask him about those sorts of prior bad acts, and the only person you would be able to ask about it is him. You couldn't prove it extrinsically, and I have exercised my discretion that that is not a road we are going to go down.
 (App. 155-56.) The court added that logistical concerns militated against allowing defense counsel to question Cooper about his robbery charge:
 I would have to adjourn the trial. I would have to advise him of his Fifth Amendment privilege. If he indicated he didn't want to claim his Fifth Amendment privilege, I would feel compelled to notify his lawyer and let him consult his lawyer, and what you will get out of it at the end of this is extremely unlikely to be anything....
 (App. 156-57.)
 
 
 [10]
 For the same reason, Temple's reliance on the following exchange, which took place during the same direct examination, is equally peculiar:
 Q. When you got back to [Marilyn Harris's] house that evening, tell us what occurred when you arrived?
 A. When we pulled up, I knocked on the door. She wasn't at home. My informant recognized the car--
 MR. BRANNON: Objection.
 THE COURT: You are not going to be able to tell us what your informant said, and saying what he recognized is just another way of saying what he told you.
 (App. 171-72.)
 
 
 [11]
 Specifically, the government notes that defense counsel had impliedly accused Agent Patton of either lying about having negotiated with Temple for the purchase of one gram of cocaine or using a portion of the cocaine for his own illegitimate purposes
 
 
 [12]
 Application note 2 to section 3E1.1 provides:
 This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.
 
 
 [13]
 In fact, the plea bargain that arose out of this federal charge provides the foundation for Temple's first challenge to his conviction. As noted above, Temple argues that in exchange for his plea the government agreed not to prosecute him for his involvement in crimes that it either knew of or was presently investigating