RENDERED: DECEMBER 13, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-1475-MR

JOHN JOSEPH HART                                              APPELLANT

APPEAL FROM KNOX CIRCUIT COURT
v.       HONORABLE MICHAEL O. CAPERTON, JUDGE
ACTION NO. 23-CR-00100

COMMONWEALTH OF KENTUCKY                                      APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CETRULO, COMBS, AND EASTON, JUDGES.

CETRULO, JUDGE: Appellant John Joseph Hart ("Hart") challenges his conviction and five-year sentence for bail jumping. On appeal, he claims numerous errors, including improper evidentiary rulings, inappropriate limitations on his defense, and procedural error, all amounting to cumulative error. While we agree that the trial court erred and the prosecutor misstated the law during the trial, those errors did not amount to cumulative error. Thus, we must affirm.

## BACKGROUND

In December 2022, Hart was charged with theft and possession of a handgun by a convicted felon. On April 4, 2023, he was released on a $7,500 bond posted by his father. Hart signed the bond release form ("bond form") acknowledging he needed to appear at all subsequent court dates. Hart appeared at his next court date on April 17, and, at that time, the court instructed him to appear for his pre-trial hearing on June 16.

On June 16, Hart did not appear nor notify his counsel (or the court) of his absence. Subsequently, the court issued a bench warrant, and the defendant was charged with bail jumping. Five days later, Hart was arrested on the bench warrant. Arguing extenuating circumstances – the poor health of both his father and one of his brothers, Marty Hart ("Marty") – Hart pled not guilty to bail jumping.

On September 6, 2023, one day before trial, the Knox Circuit Court held a pre-trial hearing on the bail jumping charge. During this hearing, the Commonwealth moved to exclude an audio recording put forth by Hart during discovery. This recording was of a 911 call made on June 18, two days after the missed court date. On the 911 call, a woman (Marty's former paramour) requested an ambulance for Marty, who was having a seizure. Hart could also be heard on the recording requesting an ambulance for his brother. During the pre-trial

hearing, Hart argued that the recording supported his assertion that there were extenuating circumstances surrounding his missed court date. The court did not agree and excluded the 911 recording because it was "displaced in time," did not "relate back" to the missed court date on June 16, and it was not Hart in medical distress during the recording.

On September 7, 2023, the Knox Circuit Court held a one-day trial. The Commonwealth called Knox County Clerk Greg Helton ("Clerk Helton"), and Laurel County Deputy Sheriff Skylar McFarland ("Deputy McFarland") to testify. The defense called only Hart to testify. In rebuttal, the Commonwealth called another of Hart's brothers, Monty Hart ("Monty"), to testify.

Through Clerk Helton's testimony, the Commonwealth presented Hart's bond form and gave a copy to each juror. The bond form had several sections highlighted in yellow, including a section in the top right corner listing Hart's underlying charges as:

> TBUT Firearm
> TBUT over 10,000$^{00}$
> Poss of Handgun of a
> Conv Felon

Clerk Helton explained to the jury that these abbreviations meant Hart had been charged with "theft by unlawful taking over 10 thousand" and "other" felony offenses. Further, the Commonwealth played a video recording of Hart's

-3-

prior April 2023 court appearance that showed the court informing Hart that his next court appearance was set for June 16.

Next, the Commonwealth called Deputy McFarland to testify. Deputy McFarland, over Hart's objections, testified about the circumstances of Hart's most recent arrest on June 21, five days after his failure to appear. Deputy McFarland stated that the sheriff's office received a call about a "suspicious person" knocking on the caller's door and walking around her house. Deputy McFarland responded to the call but did not see anyone outside the home. The deputy drove to an empty parking lot down the road and turned his lights off to watch the area. He saw a man who matched the description provided by the caller, and eventually identified him as Hart. Dispatch informed Deputy McFarland of a current warrant for Hart's arrest, and the deputy took him into custody.

Next, Hart testified in his own defense. Hart explained that on June 16, he was leaving for court when his father (1) told him to check on Marty who was having seizures, and (2) not to attend court because two of his brothers, Monty and Mark Hart ("Mark"), were going to court to attempt to revoke his bond. Hart told the jury that Marty had been placed in a medically induced coma, and "as soon as I found out my little brother had come out of the medically induced coma okay, it was when I was going to turn myself in." He said he was not trying to

-4-

"disrespect the courts" by missing his appearance, but he felt he had to attend to family matters on that day.

Hart also testified about June 21, the day of his arrest by Deputy McFarland. On that day, he had been watching over his father's house from the woods behind the property. When Hart saw Monty come out of his father's house, he "took off" with his father's dog. He stated that he started looking around, knocking on neighbors' doors, trying to find someone to keep his father's dog. At one point, Hart knocked on Deputy McFarland's unmarked SUV, not realizing it was a police vehicle. When he realized that the vehicle he knocked on was a police vehicle, he looked around for somewhere to go, but realizing he had nowhere to run, chose to peacefully go along with the deputy.

On cross, the Commonwealth asked him if he intended on turning himself in after his missed court date. Instead of directly answering the question, Hart said,

> Sir, I've requested to have a fast and speedy trial on all charges, not just this charge because I'm innocent . . . Yes, most definitely I was going to come to court because, like I said, I want trials on all charges. I'm not scared of the charges, the theft over, the theft of, the firearm, and the convicted felon of a firearm . . . are charges that I'm not worried about because I picked up a bag abandoned next to gas pump. It was abandoned property.

The Commonwealth then asked Hart, "You took no steps to inform the court you would not be here on June sixteenth?" Hart answered, "I didn't have

the time." The Commonwealth followed with, "You made the intentional choice not to be here [in court] on that day?" Hart answered, "Correct."

When the prosecutor finished his cross-examination of Hart, his defense attorney indicated he wanted to redirect. The court interrupted and stated, "Well, I'll tell you what. Let me ask a question or two. I'm a little confused here myself. Then you can pick it up." Defense counsel asked to approach and objected that the court was asking questions. Defense counsel was concerned that the court's questions might indicate to the jury its position on guilt. The court overruled the objection stating that it only intended to clarify Hart's testimony.

The court then asked Hart where he was staying from June 16-21. Hart answered he was mostly staying with his little brother but visited the woods behind his father's house occasionally to watch over the property. Without further questioning from the court, Hart elaborated about the events of June 21. Hart explained he had been in the woods behind his father's house when he saw a car pull up. He was not sure whose car it was, so he entered the home, grabbed a baseball bat, hit a wall with the bat, and yelled, "Who's in my daddy's house?" Once he realized it was his brother, he dropped the bat and left the home.

Then, the court stated, "When you said they [Hart's brothers] were trying to get you arrested, did you mention FTA [failure to appear]? Was there an FTA in there somewhere?" Hart answered, "Yes, sir. . . I missed the court date

because of sickness in my family not because I wanted to blatantly disrespect the court." Then the court asked, "When you were expecting this SUV to come get ya and you walked up and as you stood there, I guess, getting ready to knock on the window or something, did you notice it had a light bar on top?" Hart said, "Yes, sir." The court said, "And, you said you were looking for a place to go once you saw the light bar?" Hart answered,

> Yes, sir. . . . If anyone has ever had a family member ill to the point they was in a coma, you don't know if they were going to make it out. Right? . . . Very scary. I did not want to be apprehended and go to jail with my brother in that condition. . . . I'd much rather elude the police so to speak and [then deal] with the FTA, not blatantly disrespecting the court, but making sure I could be there if needed for my family 'cause my family obligation is the most important thing to me above all.

This completed the court's questions and defense counsel asked a couple follow-up questions before resting its case. In rebuttal, the Commonwealth called John's brother, Monty, to testify; Monty had been sitting in the courtroom for Hart's testimony. Monty testified that a few weeks prior to June 16, Hart had told him about that court date and that Hart knew he was supposed to be in court on June 16. Monty testified that he came to court on June 16, but Hart was not present. Monty stated that he asked for and received return of the bond money his father posted for Hart.

After closing arguments, the trial court denied the defense request for a jury instruction on the choice of evils defense. The jury convicted Hart of bail jumping and recommended five years in prison. Hart appealed.

## ANALYSIS

On appeal, Hart argues the trial court erred by (A) excluding the 911 recording; (B) denying a choice of evils jury instruction; (C) allowing the Commonwealth to inform the jury of his underlying charges; (D) failing to separate the witnesses; and (E) improperly questioning Hart on the stand. Hart asserts that (F) these errors amount to cumulative error.

### A. 911 Recording

Both the United States Constitution and the Kentucky Constitution grant a right for an accused to present a defense, but that right does not "abrogate the rules of evidence." *Roberson v. Commonwealth*, 694 S.W.3d 272, 280 (Ky. 2024) (quoting *Newcomb v. Commonwealth*, 410 S.W.3d 63, 84-85 (Ky. 2013)) (internal quotation marks omitted). "When exclusion of evidence does not significantly undermine fundamental elements of the defendant's defense, a trial court has the discretion to exclude evidence to ensure the fairness of a trial[,]" and on appeal we cannot reverse without "a showing of an abuse of such discretion." *Newcomb*, 410 S.W.3d at 85 (internal quotation marks and citation omitted). "The test for abuse of discretion is whether the trial judge's decision was arbitrary,

-8-

unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (citation omitted).

Generally, all relevant evidence is admissible unless otherwise specifically excluded. *See* Kentucky Rules of Evidence ("KRE") 402, 403. Evidence is *relevant* if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. Here, the trial court determined the 911 recording – audio of Marty's paramour and Hart requesting medical assistance for Marty – was not admissible because it was not relevant; the court determined it was not relevant because the call was "displaced in time," did not "relate back" to the missed court date on June 16, and it was not Hart in medical distress during the recording. Hart disagrees and argues the recording was relevant as it supported his assertions that family obligations prevented him from attending court on June 16. Hart asserts the recording made his "testimony that his brother's health situation required his aid more probable[,]" and its exclusion violated his constitutional right to present a defense. We disagree.

The trial court correctly stated the 911 call was "displaced in time" as it took place on June 18, two days after Hart's missed court date. The trial court's determination that the call did not "relate back" to the missed court date was not arbitrary or unreasonable because Hart did not link his brother's condition on

June 18 to June 16, *i.e.*, he did not establish that Marty was in poor health on June 16 or that he needed Hart's assistance on June 16. The court informed Hart that in order for the 911 recording to be relevant, he needed to present medical testimony linking Marty's medical distress on June 18 to June 16, but Hart had no such evidence. Further, the court noted that Marty being in medical distress on June 18 was distinct from Hart himself being in distress; if Hart had needed an ambulance for his own condition on June 18 as a result of illness, that would have been more pertinent (but not inherently relevant) to the present matter than his brother's later illness.

Thus, the trial court's exclusion of the 911 recording was not an abuse of discretion as it was not arbitrary, unreasonable, unfair, or unsupported by sound legal principles. At trial, the court did not admit the 911 recording but did not otherwise limit Hart's testimony nor his defense. In fact, the court permitted Hart to testify at length as to his family members' health conditions and his familial obligations before and after his June 16 court date. The exclusion of the recording did not significantly undermine the fundamental elements of Hart's defense.

**B. Choice of Evils**

Hart argues that the trial court improperly denied his request to present a choice of evils defense to the jury. He contends that his testimony *alone*

-10-

was sufficient to show his father's and/or Marty's health forced him to miss his court date. The trial court disagreed and denied his request.

We review a trial court's decision on whether to give a jury instruction for an abuse of discretion. *Hunt v. Commonwealth*, 304 S.W.3d 15, 31 (Ky. 2009). Again, we must look to see if the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *See English*, 993 S.W.2d at 945 (citation omitted). A choice of evils justification is conduct "the defendant believes . . . to be necessary to avoid an imminent public or private injury greater than the injury which is sought to be prevented by the statute defining the offense charged[.]" Kentucky Revised Statute ("KRS") 503.030(1). It is the defendant's "initial burden to produce evidence of a choice of evils defense." *LaPradd v. Commonwealth*, 334 S.W.3d 88, 91 (Ky. 2011). A choice of evils instruction is only proper if the following requirements are met:

> (1) that the person believes the necessity of his action is mandated by his subjective value judgment (this must be weighed by the reasonableness standard);
>
> (2) that such action must be contemporaneous with the danger of injury sought to be avoided;
>
> (3) that the injury is imminent, requiring an immediate choice if to be avoided; and
>
> (4) that the danger or injury sought to be avoided must be greater than the penalty or offending charge occasioned by the action chosen by the party.

-11-

*Beasley v. Commonwealth*, 618 S.W.2d 179, 180 (Ky. App. 1981), *overruled on other grounds by LaPradd*, *supra* (citation omitted).

Hart did not establish that his father and/or Marty required his immediate assistance on June 16 or that he missed court because he reasonably believed their health condition *on June 16* outweighed his need to be in court. Hart testified that on June 16 he was heading to court when he spoke to his father on the phone. His father told him not to go to court as his brothers were going to be there seeking to revoke his bond. At that time, Hart's father was being cared for in a hospital, and Monty had received temporary guardianship over their father. Hart did not testify that he assisted Marty on June 16 or took steps toward his care in the days immediately following June 16. Also, Hart did not establish how his father required his assistance on June 16, considering he was currently in a hospital and Monty, not Hart, was appointed as his guardian. Hart testified that he wanted to be available (*i.e.*, not incarcerated) in order to attend Marty's funeral if he did not survive "the coma," but Hart did not prove Marty was in a medically induced coma *on June 16*; Marty was talking and having a seizure on June 18 and testimony implied he was placed in a coma *after* that seizure, two days after Hart's missed court date. Therefore, Hart did not meet his burden, and, as such, the trial court did not abuse its discretion in denying the affirmative defense of choice of evils.

### C. Underlying Charges

To prove first-degree bail jumping, the Commonwealth needed to show that a defendant was released on bond for a felony charge when he failed to appear for a scheduled court date. KRS 520.070. Hart was facing charges of Theft by Unlawful Taking over $10,000 and Possession of a Handgun by a Convicted Felon. The Commonwealth not only produced testimony about the theft charge but also filed an exhibit showing both charges. A copy of the exhibit was provided to each juror. Hart's counsel filed a motion in limine to preclude identification of a felony charge by stipulating to the existence of a felony charge. The circuit court denied this motion. When the issue arose during the trial, Hart's counsel renewed the objection to the evidence and was overruled. On appeal, Hart argues the trial court erred by allowing the Commonwealth to inform the jury of Hart's underlying charges. We agree.

We review the trial court's evidentiary rulings for an abuse of discretion. *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky. 2000) (citations omitted). Again, we look to "whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945 (citation omitted).

In Kentucky, evidence must be *relevant* to be admissible. KRE 402. "Evidence which is not relevant is not admissible." *Id*. Relevant evidence is

"evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. Here, the underlying charges were shown to the jury *only* to establish the charge at trial, first-degree bail jumping.

In the context of a trial of a convicted felon in possession of a handgun (or firearm as the case may be under Kentucky law), the U.S. Supreme Court has recognized the option of a defendant to stipulate to the status element of being a felon without the consent of the prosecution. *Old Chief v. United States*, 519 U.S. 172, 117 S. Ct. 644,136 L. Ed. 2d 574 (1997). Kentucky adopted this rule in *Anderson v. Commonwealth*, 281 S.W.3d 761 (Ky. 2009). When a defendant stipulates to a prior felony, or in this case to a pending felony charge, the element is established. Any further evidence about the nature of the felony charge is not relevant. No prior Kentucky case has applied the so-called *Old Chief* stipulation rule to a bail jumping case, but the logic of the rule applies with equal if not greater force to this situation. It was unnecessary for the jury to know the identity of Hart's charges, only that his release on bail was due to a felony charge. As the *specific* felony charges were not necessary – and they did not "make the existence of any fact that is of consequence to the determination of the action more probable or less probable" – the underlying charges were not *relevant* and should not have been allowed. *See* KRE 401. Thus, the trial court erred by not allowing

Hart's stipulation and abused its discretion by allowing the Commonwealth to inform the jury as to Hart's underlying charges.

When an "evidentiary [] ruling is found to be erroneous because it violated a defendant's constitutional rights[,]" such as Hart's right to a fair trial, "the error is . . . subject to harmless error review[.]" *See Deal v. Commonwealth*, 607 S.W.3d 652, 658 (Ky. 2020) (citation omitted). Harmless error review applied to a constitutional error requires us to consider the improper evidence "in the context of the entire trial and ask[] whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Staples v. Commonwealth*, 454 S.W.3d 803, 826-27 (Ky. 2014) (internal quotation marks and citation omitted). The question before us is "whether the improper evidence was of a weight, was of a striking enough nature, or played a prominent enough role in the Commonwealth's case to raise a reasonable possibility that it contributed to the conviction." *Id*. at 827.

Hart argues the improper admission came *before* his testimony, and as such, his testimony should not override the prejudicial effect of the improper admission because he was "forced to address the material in a way that would address the context for the jury[.]" Essentially, Hart argues that while his testimony might have been incriminating, he had to give the testimony in order to rebut the improper admission; he seems to argue, *but for* the improper admission,

he might not have said what he said on the stand. While that argument has credence, Hart's testimony went well beyond addressing the improper admission. In truth, Hart gave rambling answers well beyond those questions presented to him and clinched the Commonwealth's case for it.

Further, Hart's defense counsel did not ask him about the underlying charges in order to explain or mitigate their effect. Instead, Hart began discussing the underlying charges in detail during his testimony *against advice of his legal counsel*. In fact, after Hart started discussing the charges, his counsel interrupted and requested a bench conference. During the bench conference, Hart's counsel asked the court to direct his client not to discuss the underlying charges. The court told defense counsel that such a direction should come from counsel, not the court; Hart's counsel told the court that he had instructed Hart not to discuss the charges, but Hart did so against his advice.

Additionally, Hart admitted on cross that he knowingly missed court, at least in part, because his father warned him that his brothers were going to request return of his bond and he was likely to be incarcerated as a result. As Hart was discussing his father's dementia, Hart volunteered, somewhat irrelevantly, that he was a convicted felon. Hart also testified that on the day he was arrested, he did not approach Deputy McFarland in an attempt to turn himself in but, rather, approached the vehicle thinking it was a ride he had arranged. After he saw the

light bar on top of Deputy McFarland's vehicle, Hart decided not to attempt to evade Deputy McFarland because he had "nowhere to go" and he'd "run as hard as [he] could run," and the deputy was a "pretty big man." Therefore, the improper admission, under these circumstances, was harmless because there is no substantial possibility that the "outcome of the case would have been different" had the bond form been properly redacted.[1] *See Exantus v. Commonwealth*, 612 S.W.3d 871, 890 (Ky. 2020) (citation omitted).

### D. Separation of Witnesses

Before the trial began, Hart motioned for separation of the witnesses. In response, the prosecutor misstated the law and said, "I don't have to exclude rebuttal witnesses." Apparently relying on this inaccurate statement, the court *only excluded Hart's witnesses*, but not the Commonwealth's. Monty remained in the courtroom for the entire trial, and specifically, during Hart's testimony. KRE 615 states:

> At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses and it may make the order on its own motion. This rule does not authorize exclusion of:
>
> (1) A party who is a natural person;

---

[1] Hart also argues the trial court improperly permitted Deputy McFarland to discuss why he was in the area on the night Hart was arrested and the "suspicious person" call he received. While this admission was likely not error, further discussion is unnecessary because, as established above, even if it was error, the deputy's testimony had no reasonable possibility of changing the outcome in light of Hart's own admissions during testimony. *See Exantus*, *supra*.

> (2) An officer or employee of a party which is not a natural person designated as its representative by its attorney; or

> (3) A person whose presence is shown by a party to be essential to the presentation of the party's cause.

Due "to the mandatory language of the rule," the trial court must separate witnesses "unless one of the three enumerated exceptions appl[y]." *Justice v. Commonwealth*, 987 S.W.2d 306, 315 (Ky. 1998). KRE 615 ensures that a testifying party "cannot hear the testimony of other witnesses." *McAbee v. Chapman*, 504 S.W.3d 18, 24 (Ky. 2016). The rationale behind the rule is the recognition that a witness who has heard the testimony of previous witnesses may be inclined, consciously or subconsciously, to tailor his testimony so that it conforms to the testimony given by other witnesses. *Smith v. Miller*, 127 S.W.3d 644, 646 (Ky. 2004) (citation omitted). The rule does not make an exception for rebuttal witnesses. *See Stidham v. Commonwealth*, No. 2003-SC-0211-MR, 2005 WL 629003, at *5 (Ky. Mar. 17, 2005) ("the trial court erred when it determined that rebuttal witnesses are excepted under [KRE 615]").[2]

Here, the Commonwealth did not invoke one of the KRE 615 exceptions at trial, nor are they arguing an exception on appeal. In fact, from the

---

[2] As this case is unpublished, we cite it merely as persuasive, not binding. *See* Kentucky Rule of Appellate Procedure 41.

prosecutor's commentary during the trial,[3] it is apparent that he intentionally kept Monty in the courtroom during Hart's testimony in order to know what to later challenge, *i.e.*, Monty's testimony was intentionally built around and upon Hart's testimony. This is the exact reason why we have KRE 615. Again, "[t]he purpose of the rule is to ensure that witnesses do not alter their testimony based on the testimony of other witnesses." *Cavanaugh v. Commonwealth*, 671 S.W.3d 17, 20 (Ky. 2022) (citing *Hatfield v. Commonwealth*, 250 S.W.3d 590, 594 (Ky. 2008)).

Monty's testimony was *less* about rebutting Hart's statements, and *more* about his opinion of Hart's character. The trial court permitted Monty – over *numerous* objections by Hart – to testify (mostly through hearsay) about Hart's lack of income; an occasion when Hart scared Monty's paramour; their disagreement about the care of their father; and his knowledge about how *Hart* felt about various issues and why *Hart* felt the way he did. Monty testified that Hart "knew" to be at court on June 16 because his brother Mark told him. Monty testified that Hart "knew" of his guardianship over their father and Hart "didn't like anything [he] and Mark was [*sic*] doing [to take care of their father]." Monty

---

[3] Numerous times, the Commonwealth implied and/or stated it kept Monty in the courtroom during Hart's testimony in order to build Monty's testimony. One such comment was, "[Monty] you listened to your brother's testimony. Honestly that was the reason I [kept you in the courtroom], to see if you agreed with what you heard or whether you had a different opinion about things went down on June twenty-first."

testified that Hart did not have a job and only received money from his "disability check." Monty testified that Hart looked at him with "evil eyes."

We review such evidentiary rulings for an abuse of discretion. *Hall v. Commonwealth*, 337 S.W.3d 595, 613 (Ky. 2011). Here, the trial court abused its discretion by failing to separate the witnesses after Hart invoked KRE 615; that ruling was not supported by sound legal principles. *See English*, 993 S.W.2d at 945 (citation omitted). The tougher question is whether that error was prejudicial.

While we clearly have concerns about Monty's testimony, the prosecutor's line of questioning, and the trial court's failure to grant any of Hart's objections on the matter, we cannot state that the overall effect of Monty's testimony was prejudicial because of Hart's own testimony. Hart admitted he knew about the court date and intentionally missed it. He admitted to being bipolar and receiving disability. He discussed the events of June 21 and his unfortunate interaction with Monty's paramour. Hart told the jury about the fractured relationship between he and his brothers. At one point, Hart even referred to his brothers as those "greedy f***ers." The fact that the jury heard Monty testify about his poor opinion of Hart did not turn the tide. Hart's own testimony opened the door to much of what Monty testified, and Monty's testimony was in large part foreseeable. Although hesitantly, we find the trial court's failure to separate the witness to be harmless error because it was not prejudicial but largely duplicative

of Hart's own testimony. *See Hatfield*, 250 S.W.3d at 595 (citation omitted) ("[F]ailure to separate witnesses may be harmless error under the particular circumstances of the case.").

### E. Court Questioning Hart

At trial, Hart – through questions by his own legal counsel – testified that on the day he was arrested, he had been in the woods behind his father's house. At some point, he "took off," and eventually, inadvertently, met up with Deputy McFarland. He stated that when he realized he had approached a police vehicle, he acquiesced to the arrest because, "I've run as hard as I could run." After the Commonwealth completed cross-examination, the trial court asked defense counsel if they had further questions. Defense counsel answered, "yes," and the court said, "Well, I'll tell you what. Let me ask a question or two, and I'm a little confused here myself. Then you pick it up." Over Hart's objection, the court asked Hart questions in front of the jury. The trial court asked:

> (1) Did I understand you correctly. . . testified that there were a lot of times between the June sixteenth and twenty-first date you were in the woods, you went and stayed in the woods some?
>
> (2) When you said they were trying to get you arrested, did you mention FTA? Was there an FTA in there somewhere?
>
> (3) When you were expecting this SUV to come get ya and you walked up and as you stood there, I guess, getting ready to knock on the window or something, did you

notice it had a light bar on top? And, you said you were looking for a place to go once you saw the light bar? I don't know. . . explain that.

KRE 614(b) permits a trial court to conduct interrogation of witnesses, "whether called by itself or by a party." While this has long been the rule in Kentucky, a trial court should do so cautiously in the presence of the jury so as not to allow "personal opinions to leak into the crucible[,]" because the court's "observations and comments usually carry such weight with the jury[.]" *Davidson v. Commonwealth*, 394 S.W.2d 911, 912 (Ky. 1965) (internal quotation marks and citation omitted); *see also Sigrist v. Commonwealth*, 660 S.W.3d 636, 642 (Ky. App. 2022) (citation omitted) (stating the rule should be used "sparingly and always with sensitivity to the potential for unfairness to the litigants"). Both Federal and Kentucky state courts alike have allowed such questioning when necessary for clarity. *See United States v. Slone*, 833 F.2d 595, 597 (6th Cir. 1987); *see also Sigrist*, 660 S.W.3d at 642-43. Again, we review this matter for an abuse of discretion. *Couch v. Commonwealth*, 256 S.W.3d 7, 12 (Ky. 2008). And, we must determine if the court's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *See English*, 993 S.W.2d at 945 (citation omitted).

Here, the trial court did not give its opinion, nor ask any questions that Hart did not first present through his initial testimony. The court's questions to

Hart were limited in number and scope. The trial court's questions clarified Hart's testimony, specifically, why Hart ran away from his father's property, and if his actions that night were linked to his missed court appearance or some other reason.

The better course of practice would have been for the trial court to hold his questions until *after* legal counsel completed its questioning, or to express its concerns and invite counsel to clear up matters. Still, we cannot say the trial court abused its discretion by asking three clarifying questions. Again, Hart's original testimony – not including the testimony elicited by the trial court's questions – overshadowed the testimony elicited by the trial court's questions. The testimony elicited by the court's questions did not create a "substantial possibility that the result would have been any different[.]" *See Schoenbachler v. Commonwealth*, 95 S.W.3d 830, 836 (Ky. 2003).

**F. Cumulative Error**

To be clear, Hart missed a court date related to *pending charges* (not a missed court date post-*conviction*) and was peacefully arrested five days later. For this, he received a *five-year* prison sentence after a trial that included error by the trial court. While that is certainly an extreme situation with a steep sentence, the question before us is not whether we would have decided the matter similarly or whether we agree with the jury's sentencing recommendation. Here, our review is limited to the individual issues on appeal and the cumulative effect of the trial

court's errors. Here, in light of Hart's incriminating testimony and the nature of the trial court's errors, we cannot find that Hart met his high burden for establishing cumulative, reversable error.

Under the cumulative error doctrine, "multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010). Kentucky courts "have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial." *Id*. (citing *Funk v. Commonwealth*, 842 S.W.2d 476, (Ky. 1992)). Here, the trial court's errors did not prejudice Hart, as he admitted his guilt and gave the jury every reason to believe he intentionally skipped his felony court date because he did not want to go back to prison, not because he had to attend to unavoidable, immediate family matters. Although errors crept in, those errors did not render the trial unfair. *See Brown*, 313 S.W.3d at 631.

## CONCLUSION

Accordingly, we AFFIRM the Knox Circuit Court.

COMBS, JUDGE, CONCURS.

EASTON, JUDGE, CONCURS AND FILES SEPARATE OPINION.

-24-

EASTON, JUDGE, CONCURRING:  I concur in the thorough Opinion of the Court because the circumstances of this case preclude a finding of anything other than harmless error with respect to the errors claimed by Hart.  I write separately because the evidence of the pending charges against Hart was relevant as defined, even with a stipulation, but must be excluded under KRE 403.

As we have said, evidence is *relevant* if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  KRE 401. Even with a stipulation, the testimony about pending charges and the record of the pending charges meets this definition of relevant.

In this bail jumping case, the existence of a pending felony charge is an element of the crime and thus of consequence to a finding of guilt.  Testimony about such a charge or a record of such a charge makes the existence of that charge more probable.  The evidence is relevant.

With a stipulation, the issue becomes whether additional relevant evidence should be excluded under KRE 403.  Because the element has been admitted, more evidence about it is a waste of time, specifically a needless presentation of cumulative evidence.  This is to be avoided under KRE 403.

KRE 403 also requires the exclusion of unduly prejudicial evidence. The trial court must balance the danger of such prejudice against the probative

value of the evidence. When a defendant stipulates, the element is established. Any further evidence about the nature of the felony charge has reduced probative value. "The probative force of a particular item of evidence is, therefore, inherently dependent upon the overall probativeness of other available evidence on that point." *Hall v. Commonwealth*, 468 S.W.3d 814, 823-24 (Ky. 2015). With a stipulation, the Commonwealth no longer needs any additional evidence about the pending charge. The danger of undue prejudice then obviously outweighs the probative value of the additional information.

Even with the expressed concerns about the errors in the circuit court proceedings, the undisputable facts based on evidence properly introduced about Hart's actions leave no doubt of the legitimate outcome of the case. Any errors committed were harmless.

BRIEFS FOR APPELLANT:

Molly Mattingly
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

Matthew R. Krygiel
Frankfort, Kentucky